UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SYLVIA A. SPEARS | * | CIVIL ACTION |
| VERSUS | * | NUMBER: |
| JEFFERSON PARISH SCHOOL BOARD AND DR. JAMES MEZA in his official capacity as Superintendent of Jefferson Parish Public School System | * * | SECTION: " " |

\* \* \* \* \* \* \* \* \* \*

## COMPLAINT

The complaint of Sylvia A. Spears, a person of the full age of majority who is domiciled in the Eastern District of Louisiana, with respect avers the following violations of her federally protected right under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (hereinafter "Title VII"), Age Discrimination in Employment Act, 29 U.S.C. Sec. 621 et seq. (ADEA), the Americans with Disability Act (hereinafter ADA), 42 U.S.C. §12101 et seq., the Family Medical Leave Act (hereinafter FMLA)(29 U.S.C. § 2601 *et seq*.) and relative state law in the following respect:

1.

This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 200e et seq., the Age Discrimination in Employment Act, 29 U.S.C. Sec. 621 et seq., the Americans with Disability Act, 42 U.S.C. §12101 et seq. and the Family Medical

Leave Act (hereinafter FMLA), 29 U.S.C. § 2601 *et seq.*, as hereinafter more fully appears. This court has jurisdiction over the actions under 28 U.S.C. §1331. The supplemental jurisdiction of this court is invoked for claims arising under the laws of the State of Louisiana.

### 2.

The defendant in this matter are:

Jefferson Parish School Board (hereinafter, "Board"), a public body corporate, organized and existing under the laws of the State of Louisiana[1], and Dr. James Meza, Jr., Superintendent of the Public Schools of Jefferson Parish, Louisiana. The School Board is charged by the laws of the State of Louisiana with the duty of operating a system of free public schools in the Parish and is presently operating the public schools in the aforesaid Parish pursuant to these laws.

Dr. James Meza, Jr., a person of the full age of majority and the Superintendent of the Public Schools of Jefferson Parish, Louisiana, domiciled in the State of Louisiana within the jurisdiction of this court, is appointed to manage and operate the School System under the authority of the Board.

### 3.

At all times pertinent herein, the Board acted with deliberate indifference

---

[1] R.S. 17:51; The School Board has the power to make rules and regulations for its own government consistent with the laws of the State of Louisiana and the regulations of the State Board of Elementary and Secondary Education, and to levy taxes and collect revenues through state-approved means. The chief duties of the Jefferson Parish School Board are to: Appoint the Superintendent of Schools; Establish school attendance boundaries; Establish public schools as it deems necessary to provide adequate facilities; Determine the number of teachers to be employed and to determine local supplement to their salaries; Approve the central office and school based administrative staffing formulas and the associated salaries; Formulate educational and other policy; Establish short-and long-range planning processes; Adopt a balanced annual; budget, and Exercise oversight authority for all financial matters.

towards plaintiff regarding her age, race, gender, disability and frequent medical problems associated with her disability. The Board was aware of the plaintiff's disability and status at the time of its indifferent treatment as fully shown herein:

**4.**

The plaintiff is an African American female who began her career with the Jefferson Parish School System in 1983 as a certified teacher.

**5.**

The plaintiff's employment record shows and establishes that she was a successful administrator, per her evaluations and subsequent promotions throughout her tenure in the Jefferson Parish School System.

**6.**
**RACE, AGE AND GENDER BASE**
**DISCRIMINATION AND RETALIATION**

On July 2, 2004, Diana M. Roussel, Superintendent, administratively reassigned the plaintiff to the position of Principal of Waggaman Special School pending the Board's approval. On August 4, 2004, the Board approved the plaintiff's promotion and assigned her as Acting Principal effective August 2, 2004 thru June 30, 2005.[2] In a Board meeting held on July 6, 2005, the plaintiff's status was changed

---

[2] Plaintiff's promotion was published on August 22, 2004 in the Sunday's edition of the Westwego Picayune "Special Back-To-School Edition".

from Acting Principal to Principal[3] of Waggaman Special School effective August 1, 2005 thru June 30, 2007 as she was qualified for this position.

**7.**

At the time the plaintiff was assigned as Acting Principal of Waggaman Special School, it was a failing educational institution, as the students test scores were below average and teachers accountability was never at issue. As Principal, she developed and initiated a "Modified School Improvement Plan". The Plan focused on a host of creative initiatives to increase faculty and student expectations and achievements. The student's academic performance improved and the school was no long identified as a failing educational institution. The plaintiff's contract remained in effect until she was reassigned, involuntarily, to Cuillier Career Center on July 25, 2007[4] as "Principal" filling the vacancy for the Assistant Principal out on leave.

**8.**

At the time the plaintiff was reassigned, she was 57 years old. She was replace at Waggaman by a 47 year old Caucasian male, Ron Butcher, with little or no experience. He was also paid a salary of $5,000 more than the plaintiff, who had been in the Jefferson Parish School system for 24 years. Cuillier, at the time of plaintiff's

---

[3] R.S. 17:543 Promotion

[4] Completion probationary period pursuant to R.S. 17:541

reassignment, had a female principal by the name Foster. Ms. Forster retired and plaintiff petitioned the Board to open the position rather than appoint a male to succeed. Plaintiff remained at Cuillier for approximately 2 years as "Principal"[5] without further consideration despite the fact that she was qualified for the position. In 2010, while at Cuillier, plaintiff was reclassified as a "Principal on Special Assignment".

### 9.

On July 14, 2011, the Board posted an advertisement for a School Principal for Cuillier and other schools in Jefferson Parish. The Board subsequently hired Mark Perry, a younger African American male, with little or no experience, as Principal with a salary greater than the plaintiff. The plaintiff, at the time of being replaced by a male, had been in the Jefferson Parish School System for 28 years. The Board has systematically removed qualified females from leadership roles and replaced them with males less qualified than the female they replace.[6]

### 10.

Further, the plaintiff, with 28 years of experience, salary is less than male

---

[5] Violation of R.S. 17:543 - a demotion after obtaining permanent status

[6] *e.g.* Christine Templet, Principal of Thomas Jefferson Magnet High School, replaced by Dr. Gerald LeBlanc, the school's founding principal. Templet attributed the decision to the district's RIF (reduction in force) to slash $30M from the school system's general fund budget. Test scores, under Templet, boosts in 3 out of 4 areas on the graduate exit exam.

assistant principals and principals with less experience than plaintiff, a factor that is based on gender and race. Plaintiff's salary is also comparably less than Caucasian females with regard to race and experience.

**11.**

Accordingly, the Jefferson Parish School Board, who published the salaries of it's employees in the Times-Picayune showed a serious disparity between males and females. More in particular, the Board published that the plaintiff salary as earning $83,075.74 with 38.5 years in the system. This reported salary is much more that what the plaintiff has actually earned. According to the school systems salary schedule under R.S. 17:421 et seq., the plaintiff should be and should have been receiving $94,394[7], an $11,318.26 minimum disparity based on the salaries provided therein.

**12.**

In comparison to male principals and assistant principals to female principals and assistant principals, the Caucasian male principals, with less than 25 years, earns an average salary of $92,000 annually and the Caucasian female principals, with less than 37.5 years earns an average salary of $87,000. The African-American male principals earns an average salary of $86,000 and the African-American female

---

[7] Pay scale Master's Degree + 30 years

principals with 30 years + earn an average of $80,000 annually.

### 13.
### AMERICANS WITH DISABILITY ACT,
### FAMILY MEDICAL LEAVE (FMLA) AND RETALIATION

In 2004, the plaintiff was diagnosed with Lupus erythematosus[8], fibromyalgia[9] and osteoarthristis. The Board became aware of the plaintiff's illness during her principalship at Waggaman. On December 29, 2011, the plaintiff's diseases flared that caused extreme pain and discomfort. The plaintiff was again diagnosed with Lupus erythematosus, fibromyalgia and osteoarthristis[10] as the cause of her pain and

---

[8] Lupus erythematosus, or lupus, is an autoimmune disease characterized by chronic inflammation. Autoimmune diseases occur when the body's immune system mistakenly attacks its own cells and tissues. The resulting inflammation from lupus commonly affects the joints, skin, kidneys, blood cells, brain, heart, and lungs. Lupus tends to be mild and then "flare up" from time to time, during which symptoms worsen. Lupus can also completely disappear for periods of time. Individuals symptoms of lupus vary both over time in one individual, and between individuals. In general, symptoms can include fatigue and fever; joint pain, swelling, and stiffness; facial rash; skin lesions that worsen in sunlight.

[9] Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals. Symptoms sometimes begin after a physical trauma, surgery, infection or significant psychological stress. In other cases, symptoms gradually accumulate over time with no single triggering event.Fibromyalgia is second only to osteoarthritis as the most common condition afflicting the musculoskeletal system. There are a number of different symptoms of fibromyalgia in women, and many of them can be quite painful, if not downright incapacitating. While some people that develop the condition can perform basic day-to-day tasks, a significant proportion experience symptoms of such severity that work or other activities are impaired. In fact, some of the symptoms of fibromyalgia in women can be so severe that even movement is not possible.

[10] Osteoarthritis (OA) also known as degenerative arthritis or degenerative joint disease or osteoarthrosis, is a group of mechanical abnormalities involving degradation of joints, including articular cartilage and subchondral bone. Symptoms may include joint pain, tenderness, stiffness, locking, and sometimes an effusion. A variety of causes—hereditary, developmental, metabolic, and mechanical deficits—may initiate processes leading to loss of cartilage. When bone surfaces become less well protected by cartilage, bone may be exposed and damaged. As a result of decreased movement secondary to pain, regional muscles may atrophy, and ligaments may become more lax. Osteoarthritis is often called wear-and-tear arthritis, the disorder most commonly affects joints in your hands, neck, lower back, knees and hips. Osteoarthritis gradually worsens with time, and no cure exists. Treatment generally involves a combination of exercise, lifestyle modification, and analgesics. If pain becomes debilitating, joint replacement surgery may be used to improve the quality of life. OA is the most common form of arthritis, and the leading cause of chronic disability in the United States. It affects about 8 million people in the United Kingdom and

discomfort. According to Dr. Eve Scopelitis, M.D., these three disorders limit the plaintiff's day-to-day activities, such as climbing stairs, walking and excessive sun exposure.

**14.**

The plaintiff is an "individual with a disability" within the meaning of the ADA and qualifies for protection under its provisions. 42 U.S.C.A. § 12112(a) (2005).

**15.**

Pursuant to ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553, the plaintiff has a covered "disability," which the ADA defines in part as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). Plaintiff has been diagnosed with Lupus erythematosus, fibromyalgia and osteoarthristis by her treating physician, Stacy Siegendonf , M.D. and Eve Scopelitis, M.D., FACR. She has been and is presently being treated for her diseases.

**16.**

Due to the plaintiff's medical condition, which disability has to do with her joints, kidneys, blood cells, brain, heart, and lungs, all of which affects her day-to-day activities, such as climbing stairs, walking and excessive sun exposure, her physical

---

nearly 27 million people in the United States.

illness/impairment substantially limits one or more major life activity within the meaning of the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553.

**17.**

The plaintiff, however, is a "qualified individual with a disability", that is one with a "disability," who, "with or without reasonable accommodation, can [still] perform the essential functions of the employment position that [he or she] holds or desires." 42 U.S.C. § 12111(8).

**18.**

The plaintiff's illness did not affect her ability to perform the essential functions of her employment. However, on December 29, 2011, the plaintiff's disease flared to a degree requiring emergency medical attention.

**19.**

The plaintiff was an eligible employee under the FMLA. She worked more than 1250 hours, between December 29, 2011 thru December 29, 2012, when she was placed on approved medical leave on March 27, 2012, retroactive to January 17, 2012. The defendant is a covered employer and employs more than 50 employees within a 75 mile radius of the worksite and the plaintiff has not use any leave within the last 12 months of employment.

**20.**

Pursuant Jefferson Parish Public School System's Human Resources Policy Manual(hereinafter "HRPM), Regular employees who work eleven(11) and twelve(12) months shall be credited on the day of reporting for duty with eleven(11) or twelve(12) days respectively to be used for personal illness and/or emergency. Upon completion of their first full or partial fiscal year of employment, who continue their employment, shall be credited with additional eleven(11) or twelve(12) work days to be used for personal illness and/or emergency and shall accrue to their sick leave any unused days, without limit, from the previous fiscal year.

**21.**

The plaintiff shows that she had not taken sick leave during her tenure in the Jefferson Parish School System but once or twice, which was long before this sudden illness and diagnoses in 2004.  Pursuant to HRPM, plaintiff has accrued a minimum of 46 weeks of earned paid leave.  Forty-Six (46) weeks covers January 1, 2012 thru November 16, 2012.

**22.**

In January, 2012, the plaintiff was placed under doctor's care and her physician, Dr. Stacy Siegendonf , M.D. provided a statement supporting the

plaintiff's medical leave from January 17, 2012 thru August 1, 2012.[11]

**23.**

According to the State of Louisiana Department of Education, no leave request had been received from the Board and the plaintiff had not been to work since December 29, 2011. The Board held the plaintiff's medical leave request for three (3) months. She was marked absent from work and docked for unexcused absences for the entire period until her leave was approved.

**24.**

On March 27, 2012, Human Resources, by certified mail, acknowledged receipt of plaintiff's request for Medical Sabbatical Leave. Plaintiff was given notice that the Board, pursuant to R.S. 17:1175 C(2)(b)(i) and R.S. 17:1202 E(2)(a) of it's right to obtain a second opinion on the plaintiff's medical condition prior to granting leave. The notice further provided that their physician found sufficient cause to approve leave, effective January 7, 2012 thru May 25, 2012.

**25.**

On April 5, 2012, the plaintiff receive approval of her much need medical

---

[11]Physician Statement is required by Louisiana R.S. 17:1170 et seq.; Also, pursuant to the Human Resources Policy Manual: if the employee is requesting paid sick/emergency leave for his own illness and/or treatment or for the illness and/or treatment of a family member and he/she anticipates that the leave will exceed six days, then the employee must have his/her treating physician or the family members' treating physician certify the need for the leave according to the provisions for certification pursuant to Section IV-AA, Paragraph 3, covering leave under the Family Medical Leave Act.

leave. However, the dates of her leave was modified to January 17, 2012 thru May 25, 2012, notwithstanding the treating physician requested a longer period of time. The plaintiff was not paid any back pay during the processing of and the subsequent approval of her leave application.

**26.**

On April 12, 2012, the plaintiff made application for additional extended leave for reason of a scheduled surgery. The additional extended sick leave available was 90 days. On April 14, 2012, the plaintiff's physician, Dr. Stacy Siegendonf, M.D., provided another statement in support of leave from May 25, 2012 thru September 28, 2012. However, neither the Board nor Human Resources acknowledged the request. The application was never processed.

**27.**

While out on leave, the defendant on July 14, 2012 forwarded their notice of termination in violation of the FMLA. The action of the defendant was a retaliatory act against the plaintiff protective activity in violation of the FMLA. The defendant's adverse action against the plaintiff is the result of the extended leave of the plaintiff and her inability to return to work as demanded.

**28.**

During the entire period under which the plaintiff remained on leave, she

wasn't receiving any wages from the defendant and when the wages begun, it was insufficient to pay her bills and purchase food. The Human Resources require that all personnel out on extended leave shall receive 65% of their regular wages.

**29.**

According to the published salaries of the defendant's employee, plaintiff allegedly earned $83, 075.74. Sixty-Five percent (65%) of the reported salary is $53,999.24 annually. The plaintiff's monthly gross income during her leave period, based on the 65% rule, should have been $4,499.94 monthly. Instead, according to plaintiff's W-2, her monthly income was $2,481.10, a difference of $2,018.84 monthly and $24,226.08 annually.

**30.**
**STATE CLAIM: FRAUD AND MENTAL ANGUISH**

Fraud is "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. C.C. art.1953. Fraud must be proved by a preponderance of the evidence, although it may be proved with circumstantial evidence. La. C.C. art.1957.[12]   Misrepresentations ........ have given rise to damages for mental anguish, but the mental suffering must be more than minimal worry and

---

[12] Lamarque v. Barbara Enterprises, Inc., 2006-1422, (La. 4th Cir., 4/25/ 2007) 958 So.2d 708

inconvenience over the consequences of the damage.[13]

**31.**

General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, stress, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms."[14]

**32.**

The plaintiff suffered mental anguish over the significant decrease of income and the defendant's violation of R.S. 17:543,changing her employment status to reduce her income, with complying with the law.  The plaintiff, after being promoted to principal, her income changed slightly, but not to the pay scale as required in R.S. 17:421.

**33.**

The plaintiff suffered weeks of receiving no income, due mainly to the defendant not processing the medical leave request and docking her 100% for being absence rather than on medical leave.

---

[13] Dousson v. South Central Bell, 429 So.2d 466 (La.App. 4th Cir.1983).

[14] Kaiser v. Hardin,  06-2092, (La. 4/11/07), 953 So.2d 802; Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 So.2d 670;Orellana v. Louisiana Citizens Prop. Ins., 07-1095 (La. App., 12/5/07),972 So.2d 1252.

**34.**

When the defendant decided to compensate the plaintiff while on medical leave, the defendant violated their HRPM that required plaintiff be paid 65% of her regular salary.

**35.**

Plaintiff would receive $200-$400 per pay period and on occasions she would receive $1,000.

**36.**

The defendant changed the plaintiff status to reflect her not ever receiving principals pay but assistant principal's pay. The status of assistant principal was never identified on plaintiff's pay-stub until after the plaintiff began challenging the defendant regarding her principal's grade after being promoted in 2004.

**37.**

Even if the defendant had begun paying the plaintiff at the assistant principal's pay rate, the gross income, as compared to what she was receiving, would have been a violation of the 65% rule. The plaintiff was faced with having to request funds from her retirement to survive and pay her medical expenses.

**38.**

The plaintiff was also scheduled to retire in 2014 or 2015 after already

completing her drop period. To receive full retirement benefits, plaintiff needed an additional years. The defendant, however, forward a notice of termination, while on medical leave, forcing her to retire or be terminated prior to the completion of the additional two years needed for full retirement.

**39.**

The lack of income from the defendant's contemptuous and deceptive action, with deliberate indifference, caused the plaintiff to suffer. Their act of terminating the plaintiff and forcing her into retirement was the only remedy available to the plaintiff to receive sufficient income to maintain her standard of living and survive.

**40.**

Superintendent, Meza, of the JPSS endorsed and enforced all complained of violative acts stated herein with full authority of the JPSB.

WHEREFORE, petitioner prays that after due proceeding had, there be judgment in favor of the plaintiff, Sylvia A. Spears and against the defendant, Jefferson Parish School Board.

1. Award compensatory damages to the plaintiff as would fully compensate her for pain and suffering caused by the violative conduct against her as alleged in the complaint.

2. Award punitive damages to the plaintiff as would fully sanction the defendant to deter future violative acts of discriminatory conduct.

3.  Award judicial interest from date of demand on the aggregate damage amounts.

4.  Award court cost and all equitable relief deemed appropriate by this court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and relative statutory provision of Title VII of the Civil Rights Act of 1964, as amended.

> Respectfully submitted,
>
> /s/ Willard J. Brown, Sr..
> Willard J. Brown, Sr. #23405
> 4619 S. Claiborne Ave
> New Orleans, LA 70125
> (504) 638-2274

## CERTIFICATE

I hereby certify that on this 25th day of October, 2013, I electronically filed the foregoing Complaint, with the Clerk of Court, by using the CM/ECF system which will send a notice of electronic filing to the following: CT Corporation System. I further certify that I mailed the foregoing document and notice of electronic filings by first class mail to the following non-CM/ECF participant: CT Corporation System.

/s/ Willard J. Brown, Sr.
Willard J. Brown, Sr.